Good morning, Your Honor. May it please the Court, my name is Douglas Steele and I'm here today on behalf of the plaintiffs' appellants in the matter before the Court this morning, and I would like to reserve three minutes of my time for possible rebuttal. Counsel, I've got a factual question. I just had trouble understanding the record, Your Honor, and it's real important to me. Do they get two complete turnout outfits, or do they just get one complete turnout outfit and the clothing but not the helmet and protective gloves for the other turnout outfit? It is the latter. There are not two complete sets of turnout gear. They receive two pants and two jackets, but they only receive one helmet, boots, gloves, EMS jacket. All I could get for that, I couldn't get a – I couldn't find a statement that said that in the record. All I could get was a statement that said they get two sets and they get – and then the description of the second set didn't mention the helmet. So there might be a negative pregnant that they didn't get the helmet and gloves with the second set, but I didn't get a direct statement that they didn't. I believe that's in the party's stipulation and that it is – That's what I'm talking about. – is not controverted. And I can provide you the court with a supplemental citation to the record on that, perhaps. Let me follow up with a factual question of my own because it was hard for me to kind of visualize it from reviewing the record. Gear, equipment, what are we talking about here? How big is the bag? There was some suggestion that it takes up the whole back seat. You've got the clothing, the hard hat, but what other equipment is there that they'd have to have in order to show up for work? What they have – and it's enough equipment, and it's uncontroverted in the record, enough to fill up approximately the back seat of a car. You have the heavy protective jacket that firefighters are required to wear if they're responding to a fire or a hazmat incident or an event of that nature. You have the pants. You have the specialized boots. You have the protective helmet. You have the protective gloves. You have an EMS jacket that they wear on EMS calls that protects themselves from contaminants and blood issues and related aspects, as well as tools, including sharp instruments – and I don't have the list and it's not in the record of all of the tools that are in the EMS tools that they are assigned and provided. So they have all of this material that are essential, necessary equipment that they need to do their job. And that's what makes up the material that, when the employer assigns them to a temporary station, they're required to gather this material, load it in their personal loan vehicle, and transport it to the temporarily assigned station. And the issue in this case, of course, is our contention that the district violated the Fair Labor Standards Act by failing to properly compensate the firefighters in a couple of different ways. And I should say that all the firefighters are either also EMTs or paramedics, which is why, in addition to what you think of as traditional firefighting gear, they also need to bring with them and transport emergency medical gear. The first matter is the failure to count as hours worked, the time spent gathering and transporting this necessary equipment from the station location. In determining whether the transportation of all of this equipment that you've just described, whether it's indispensable to their work, why isn't this similar to the Smith case or the Vanilla case, where the court really characterized the transportation of the equipment and clothing as just the personal safety gear that's required for them to show up to work? So it's really preliminary to the principal activities of employment. Well, the reason that I think this doesn't qualify, I think that this falls more into the category of Alvarez, of specialized equipment that goes beyond just minor personal protective equipment that they have to have with them and have immediate access to during the course of their employment. And the significant issue where that is concerned is that it's not otherwise provided for the employee at the temporarily assigned station, and there's a variety of reasons why continually transporting it with them in their personal vehicle whenever they're off-duty is not practical. I couldn't see why it wouldn't be. It looked to me, I suppose a little bit informed by just ordinary knowledge, that it would be about like if you have a kid who plays hockey and you've got this gigantic duffel bag, and it's kind of a nuisance having it in the back of the car, kind of a nuisance having it in the trunk if your car has a trunk instead of a hatchback. Kind of a nuisance having it in the garage or the entryway to your house. But the kid plays hockey, so you do. And I couldn't really see where it was different. The only way I could see where it would be any different would be if the firefighter goes home, he's off-duty, and he gets a call, we want you to report to a different station. Now, if it's an emergency call, he's paid from the moment of the call, and then he goes to his home station, he gets his stuff, and then he goes home. He gets his duffel, he goes to the other station. And the other was, I think what you call voluntary, other station assignment. And that's where somebody was sick at another station, so they call him at home, you want to take this, get overtime for it? And he says yes. And that looked to me like the only situation where he might have reasonably left the duffel at his home station. And have to drive to his home station to get it. And that's why I asked you whether there were two helmets and two sets of gloves and boots and so forth. Because in that case, he could keep one at home, and everybody has inconveniences and parts of their houses that are taken up with stuff that's related to their work. And that would be perfectly, it would just be a matter of personal convenience not to have it at home. But I can't understand, if he does get that call, can he, when does he start getting paid, and does he know that that call may be coming, and can he have all his gear at home so that he doesn't have to drive to his home station to get it? Well, there's several aspects to that. And the issue on whether it benefits the employer to have the employees do that is not simply a matter of where the equipment is stored. It's also a question of whether it benefits the employer to have Oh, let's stipulate that. You can't fight fires without firefighting gear. Right. And if you have two sets, the convenience of having both sets at the office, that's personal and not for the benefit of the employer. Right. And in this case, Your Honor, there are not two complete sets of the material and gear required for fighting fires or responding to natural disasters or hazmat. You don't have two helmets. You don't have the two sets of boots, gloves, tools, EMS jacket. You have two sets of turnout pants and the turnout jacket, and that's it. So it's a misnomer to say Okay. So how do you get paid? So what you're saying is for the benefit of the employer, since you can't fight fires without the gear, you have to go to your home office, get your gear, and then drive over to the other fire station. When does his pay start when he pulls one of those? I guess that's not an emergency. Emergency gets compensated from the time of the phone call. That's a voluntary filling in for somebody who got sick, typically, in order to pick up some overtime. When does he start getting compensated? When he shows up at his home station to get his gear or when he makes it to the other station where he's filling in for somebody? The way it operates in the district is in the absence of the rare exception of emergency overtime. The person begins receiving compensation when they arrive to work at the start of the shift at the temporarily assigned station, and there are multiple circumstances where this occurs, and not all are overtime shifts. And the citations in the record that one of the common occurrences... Now, does he have notice the day before that he's going to be doing that shift at a different station? Not always, Your Honor. The facts of the case demonstrate, among other things, that one of the common circumstances is that these firefighters will typically show up to their home station for a regularly scheduled shift 20, 30 minutes in advance. And it's not uncommon to be told, today we have a shortage at Station 7, you're going to have to go to Station 7 today. And so that firefighter doesn't wait until 8 o'clock to begin gathering his protective equipment, loading it in his vehicle, and transporting it to Station 7. Let's see. So what happened is he shows up, his shift starts at 8, he shows up at his home fire station at 7, and he goes to Station 7. It's 7.30, quarter to 8, and they say, this is voluntary, but you want to fill in over at a different station, some guy got sick. And he says, okay, and then he packs up his gear at his home station, where he already is. Is that what you're talking about? No, Your Honor. It's not voluntary, because this is a regularly assigned work day, and the employer is saying, you're going to work at a different station. It's not emergency, but it's not voluntary. But you're talking about a situation, and let me clarify that, where somebody shows up early, and then they're not needed at their home station that day, and instead they're reassigned to a different station because there's a need at that different station instead, right? Yes. So why isn't that like normal home-to-work travel? Well, it's to arrive at the station that they were assigned to work. Now, it's after they arrive at the station they're assigned to work, and they're instructed that they have to work at a different station that day. That's when they begin the first... It's the gathering up of the equipment and transporting it to that next station is what you're talking about. And if they don't do that immediately and wait until 8 o'clock to begin that, they can't relieve the off-going firefighter at the other station, so someone would be held over on overtime somewhere else. Let me ask you one question before you sit down. Would your argument be the same even if the firefighters did have two full sets of gear? It would for this reason. Unlike hockey equipment or baseball equipment, we're talking sophisticated equipment that's exposed to carcinogens and various hazardous elements in the routine use of the work, and it would not be a safe proposition. That seemed like utter nonsense. There was nothing in the record to support it. Of course there are carcinogens. Any time there's carbon, there's a carcinogen. You can die of non-carcinogens. In fact, you can die of this pure water if you have too much of it. You get hyponatremia. There was no support in the record that it was medically, for any expert, that it was medically risky to bring the duffel home. Well, I would respectfully say, Your Honor, that the work that these plaintiffs do in fighting fires is much more difficult and much more dangerous than drinking a glass of water here under exposed. The firefighters for a while killed people by making them drink too much water. And runners sometimes die from it. Well, again, I respectfully suggest that the type of hazardous environments that these firefighters and their equipment are exposed to, environments that are called immediately dangerous to life and health, IDLH environment, does expose this equipment, this gear, to unique chemical hazardous conditions that affect people. It does affect the ability. Was there a medical expert testimony to support this argument you're making, that it's too dangerous to bring the stuff home? No, there was not at the summary judgment stage. Well, a couple of the firefighters used to bring it home, right? Years ago, beyond the time frame governed by this case, there's anecdotal evidence of at least one firefighter who occasionally did that. However, there are other advantages, to answer your question, and benefits to the employer of having this equipment stored at the station. When it's stored at the station, it is in a safe, secure location, specifically designed for maintaining this equipment. And therefore, it avoids any undue wear or damage that could be caused by the equipment being continually jostled and bouncing around the back seat, the trunk, the back of the vehicle. The bed of a truck, every time an employee's off-duty. So it's tough enough to fight fires in, but not tough enough to ride in the trunk? If it's continually bouncing around and being jostled on the trunk, you increase the chance that the equipment could be damaged, yes. When a guy shows up at 7.30, quarter to 8, at his home station, and he's told you have to go over to a different fire station, gathers up his gear and drives over, and he gets to the new station at 8.30, does he get a warning? Does he get paid from 8 to 8.30? Is that what this case is about, paying him from 8 to 8.30? Well, the shift is scheduled to begin at 8 o'clock, and so the case is about paying him from the time he begins to gather this equipment, where it's maintained, and arrives at the temporarily assigned station to begin the duties there. So the case is about the time from when he's told you're going to a different station today, he's at his home station where the gear is, and he doesn't get paid for packing up his gear at his home station and driving over to the temporary station? That is one of the scenarios that's at issue in the case, yes, Your Honor. Our questioning has actually taken you over your time, so I'll add a couple of minutes to the clock and give you that time for rebuttal. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, my name is Suzanne Solomon and I represent the Menlo Park Fire Protection District. I would like to address the comment about two sets of gear. We do stipulate that there are not two sets of total gear. There are two sets of the turnout jacket and the turnout pants. Those are the big things that have the reflective stripes. That's what they've got two sets of. The other items that Mr. Steele listed, he is correct in stipulating that. So they do have to, one way or another, get their helmet and boots. They do. So to these, we're not saying they have two sets of everything. We're saying they have two sets of jacket and pants, and the other items, the safety gear itself, they have one set up. But that's why I asked the last question. I mean, that doesn't even matter, right? It doesn't matter because the three situations we're talking about on travel time, in this case, are one, it's a rove within a shift, meaning you're already on the clock. You came. Let's say your shift starts at 8. You get there at 8 and they say, Suzanne, you need to be at Station 2. I go pack my stuff up. I drive to Station 2. I'm totally on the clock because I've shown up at 8. Oh, you mean you are getting paid for that time when you've shown up at your home station. Yes. And you're told go to another one and you pack up your gear and go over. Yes. And we're calling. Only if you're already on the clock. Right. But they're fighting about or arguing about, I should say, the time when you show up early. That's the second scenario. You show up early. So your shift starts at 8. You show up at 7.30. And then you're told at 7.30, by the way, we don't need you today. Go to this other station instead. And then you start to gather up your gear and you go to the other station in order to report for your shift starting at 8 o'clock at this other station. What they're arguing about is the time it takes to gather the equipment up and to drive to the other station between 7.30 and 8 sometime. That's the second scenario, right? They are making that argument. They're not saying that's the total universe of situations, but they are saying that there is a situation where someone happens to show up early, finds out early that they're assigned to rove at a different station, and they make the choice to start packing their gear up early and heading over before 8 o'clock to get at the other station. There is absolutely no evidence in this record that they are directed to do that. There is no evidence in this record that the district is aware that they're doing that. Do they get docked at the substitute station? Because if they've shown up, I mean, I guess there are some people who get to work a half hour early when they're when they work on the clock, but more likely five minutes early. So they'd actually get to the substitute station late, say, 8.15, 8.30. Do they get docked because they're not at the substitute station? No, they don't. So let's take a hypothetical. I show up at 7.50. I know I'm supposed to go to another station. You don't know yet. You find out. I find out, right. I show up, and I find out before 8 o'clock that I'm assigned at another station. I choose to start working early. I do start working early. From 7.50 to 8, I am not paid. I am paid starting at 8. Regardless of what time I get at the station, 8.15, 8.30, I'm paid from 8 o'clock because that's when my shift started, and my shift started with the knowledge and the decision by the department that I would need to go somewhere else. So that is one situation. I just want to go through and make sure we're all on the same page about the various situations. So one is the rove within a regular shift. Number two is, and this point is very important, voluntary overtime. Overtime is voluntary. The situation any time we're talking about someone being called up and asked if they want to come work at a non-home station, that is voluntary. To the extent they are being ordered to come in and work, they're being paid the minute they get that call. And is that because that's the provision of the, I don't know, like a collective bargaining agreement, or is that because it didn't seem to me that the Federal law would require that? Is that just something that the district voluntarily? That's just their practice. Their practice is when they're going to call you on the day off and say get in here, that, and you have to drop everything and get in here, and people are traveling. Some people live far away. That's the practice. It's not negotiated. I don't believe it's negotiated in the collective bargaining agreement. It's just the practice. Why wouldn't they be entitled to overtime when they get the call, hey, you want to fill in there at home? They get the call. You want to fill in for somebody over at this substitute station tomorrow? Draw some overtime? And they say, okay. Why wouldn't it be for the benefit of the employer so that they get compensated for them to drive to work and pick up their gear, or not maybe to drive to their home station, but the time from the home station to the substitute station with their gear? Because they can say no. So that's why they're not entitled to overtime in that situation. I don't understand why because they can say no creates a different legal category. I mean, if you have three people working for you and something has to be done before 8 tomorrow morning, and you say anyone want to stay late tonight and do it, it's voluntary, but it's still for the benefit of the employer, so they're entitled to get paid overtime for it. Well, I'm not saying it's a legal category. I'm saying that the district has a practice of when we're requiring you and calling you up, you know, in the middle of your son's birthday party and ordering you to come in, you should get paid at that moment. I'm not saying that's required under the law. I'm saying that's the district's practice. Over here, where I'm saying we are calling you and giving you the option to work or not, that's a choice that the law doesn't require us to pay you overtime. Why doesn't it? If you've already worked your full shift, I think a fireman basically works two days a week, doesn't he? Two full 24-hour shifts. So everything beyond that is overtime. And whatever he does on overtime is for the benefit of the employer. And even if he's free to choose not to take the overtime, I don't understand why we've already gotten to the point there's only one set of turnout gear. So he really does have to go to his home station and get his turnout gear. If he'd known in advance, he could have thrown it in the trunk of his car, but he didn't know in advance. He got the call, maybe he only works Monday and Tuesday every week, and he got the call Thursday. You want to make some more money Friday. It's for the benefit of the employer. He didn't have to do it, but he did do it for the benefit of the employer. Why doesn't he get paid for driving to his home station and getting his turnout gear and then driving over to the new station? Because he's commuting. And to the extent he didn't have his turnout gear at home. Okay. Let's say commuting takes it out for driving from home to his home station. Why doesn't he get paid from his home station to the substitute station? Because the reason he has to go to his home station was that he made the choice when he put his name on the voluntary overtime list. To get called for overtime, you have to put your name on a list saying, I want to get these calls. And when he put his name on that list, and then when he left at the end of his two-day shift. Oh, I see. There's a list in advance. Yes. And so what you're saying is if you want to list yourself to pick up voluntary overtime shifts, take your duffel home. That's right. Take your duffel home and put in your helmet, your boots, your gloves, your EMS jacket, and your EMS tools. If you don't want to do that, then when the call comes, don't take it if it's not at your home station. So you sign up for a list and say, hey, I'm willing to work overtime. Call me. And then what you're saying is that, well, then there's a choice to take the duffel back home so that when that call comes in, you can then go directly from home. And that would be normal commuting time from home to the substitute station. But if you wish to store it for convenience at the home station, and then you'd have to then accept that overtime assignment, then you'd have to drive to the home station, and then from the home station gather up the gear, and then that's the part that's not paid. Right. And that's what I'm saying. I'm saying that the point I want to make sure that's not getting lost is, even though I agree that the donning and doffing analysis from the Bamonte and the Alvarez and the Ballaras case applies here, this, the situation that we're talking about is one that someone is volunteering to put themselves in. It's not something that's happening all the time. And if they don't want to be in that situation, they don't put their name on the voluntary, the sick list, the list. The important voluntary act, it sounds like, is putting your name on the list, because if you're listing yourself to do overtime at other stations, then you would take your duffel home. Is that right? Right. Right. So I just, I would like to address briefly the Busk case, which the Court asks the parties to be ready to discuss. The point I want to make about that case is that, like this case, it's not a clear, it's not a donning and doffing case. This really is not a donning and doffing case. This is a case that involves special equipment and clothing that has a safety purpose that needs to be gathered and moved in certain situations. And so the firefighters have made the argument that those cases are really not helpful here, the district court shouldn't have relied on them. They are helpful, and the Busk case shows that, that even in a situation where that case is talking about security screening, they still went through the analysis of is this integral and indispensable to a primary activity. In that case, they found that it was because the screening was required. It was not optional. Unlike in our case, it's not required to leave your stuff at the home station. It is not required not to take it home. There's no rule that says that. Counsel, can I ask you, just before you run out of time, to talk about the sick leave issue? Yes. I will tell you, I'm not with your side on this one, and I would need help to figure out why the district court was right on that. Sure. So the annual leave cash-out is, as you know, very factually complex in terms of the evolution of the banks, the settlement that arose from the firefighters' grievance, the restricted bank where certain types of leave sit for a year before it rolls over into the annual leave. Clearly, it's kind of a hybrid plan. We can't say, oh, it's just like sick, it's just like vacation. But let me ask you this. But we know some sick leave is in there, right? We know that some – well, we don't know that some sick leave is in there. That's the whole point. Okay. Well, that I don't understand. Why don't we know that? So what happens is, and let's take pre-June 2010, which is when this – we called it the purgatory bank during depositions, when the restricted bank got created. Let's go before that because it's simpler. Okay. Each pay period, a firefighter would get an amount of hours that corresponded to the sick leave formula in the MOU and an amount of hours that corresponded to the vacation leave formula. The MOU specifically says that's how we're going to do it, even though the MOU also says we are using annual leave in lieu of vacation and sick leave. I don't understand why it's sick leave at all, except maybe for purposes of selling it to the city council. It looks to me like what they've done is eliminate the old-fashioned deal where you get annual leave for whatever you want and sick leave, but then you have to prove you're sick. And there's always a problem of fraud with sick leave and there's always a problem of irritating people by asking to get notes from their doctors and there's always a problem of having to cash out too much of it. So it looks like they're all lumped together, and you can call it mental health leave because you just feel like you need a day off and you're stressed, or you can take it for going shopping and running some errands at Home Depot, and you can take it to go fishing, and you can take it because you've got the flu and 101 fever and the employer just doesn't care. That's the way it looks to me now, like the new plan is, and I don't understand what it means to call any of it sick leave or annual leave. I agree. That is what the plan is. And so to answer both of your questions at the same time, let's say, you know, first pay period. We put six hours in using the sick leave number from the MOU, and let's say we put 12 hours in using the vacation leave. So we've got 18 hours in there. Let's say I wait six months and then I call in sick. There's no way to know what hours we took out of there, whether it was the six that got in there for sick or the 12 that correspond to vacation. Okay. That's in the pre-June 2010 rule? Yes. It's the same. It's the same now, except what happens after the settlement was we take the six hours that correspond to sick. We put those directly into the annual leave bank. It only accumulates at the sick leave rate, but it's immediately available for any purpose, as I understand it. Is that right? Those hours, yes. That's correct. So basically an employee gets six hours at the sick leave. Is it six hours at the sick leave rate and four at the annual leave? It depends. It depends. Well, no, it's all annual leave. I mean, it says that right in the MOU. Vacation, I should say. So it accumulates at the six-hour sick rate, goes in there, but you don't have to use it because you're sick. It's immediately available. If you need to go to the East Coast because your daughter's graduating, you can take that time out and utilize it. Right. And you just have to put in a leave slip. Right. So you could put that six hours in now and after 2010, and then the next week use that for an unscheduled absence. You can do that. And so I still want to get back to answering your question about the restricted bank. So post-June 2010 settlement, the hours that don't correspond to the sick, that correspond to the vacation accrual formula, sat in the annual leave restricted bank for a year and could not be used. Leave is not used out of that restricted bank. Once that year is over, it gets dumped back in here and loses the characterization of how it got there, along with all the other hours that lost the characterization of how it got there. So when someone uses a bit of annual leave, whether they're scheduling it ahead of time, calling in, saying it's a funeral, whatever it is, we're taking an hour out of that pool and there's no way, the district does not trace that. So you don't have any sick leave buyback. You just have a leave buyback. We have annual leave buyback. And so to the extent the firefighters call it sick leave buyback, that's just wrong. That's not what it's called. That's not what is in the record. You buy back and you don't care whether it was for sick or vacation because there's no distinction and you don't ask the doctor's notes? Right, because the point is to mitigate the liability of having giant pieces of leave, of paid liability to the employees. And you don't track which portion. Once it's collapsed together, you don't track which portion accumulated at the sick leave rate versus vacation restricted bank rates. Right. Once it gets put in the annual leave bank, when we take it out, we just take it out and nobody goes to try to figure out, oh, was this a 6 hours that was accrued two years ago under the sick formula one week, or was this something that got dumped in last year from the annual leave restricted bank? The district doesn't care. They don't track that. And it couldn't be tracked. Well, it could. You just don't. The district just doesn't do it. And it seems to me to the extent that your main argument is that, well, look, once it all gets dumped into the annual leave bank, there's just no way to figure it out. Too bad. Even though we can see, you can see as a legal principle that if you could identify the sick leave component, they, that would need to be factored into their regular rate. You can see that, right? You're just, your defense is, well, we just can't figure it out, so too bad. You get nothing. And that just seems wrong. No, that's not my client's position. My client's position is we don't do it. Could you do it? There's not evidence in the record to really to argue that either way, so I shouldn't have said that. But the point is, we don't do it. And so when you look at, we can't say it's just like sick or it's just like vacation. That's a false dichotomy. What we can say, though, is you don't have to not abuse it like you do with sick. We cash it out at 100 percent, which is not what we're required to do with sick, but what we're required to do with vacation. And it's not done for the purpose of making sure that we're ensuring good attendance. It was created, and this is not in dispute. This is in the documents. It's in the union's own grievance. It's in the declarations, that it was created not as a benefit or as a bonus or a way to control employees, but a way to minimize liability. And I want to, one thing I want to point out is that the firefighters say in their brief that they are required to maintain the 480 balance. That's false. They are not required to maintain that. They can use all their leave if they want. The point is, once they get to the point where they've got more than those hours accrued in the annual leave bank, those are going to be automatically cashed out every year. So it's not like the cases from the other circuits where you first had to reach this level. You had to reach this level. All right. Thank you, counsel. We've taken you well over your time. Thank you. Can I ask one more thing? When they do take leave. Counsel. I've got one more question to make sure I understand what you just said. When they do take leave, if they say, hey, I won't be coming in tomorrow or I won't be coming in next Monday and Tuesday, if that's their work days, do they, are they expected or required to say, because I'm sick or because my doctor told me not to or because I'm going vacationing with my family for a long weekend or do they just are they just required to say I won't be in Monday and Tuesday? The way I can answer that by citing something in the record is that all they're required to do is write, it gets written on their time sheet as annual leave unscheduled. Thank you, counsel. Thank you. Let's put three minutes on the clock. Thank you, Your Honor. With respect to this issue of the leave buyback, one thing that we're in agreement on is that it is a factually complex issue and unfortunately we believe that the lower court adopted the role of fact finder in reaching its conclusion because it's one thing for the employer to say, oh, it doesn't matter, they can use the leave for any purpose they want. They can stand up here today and assert that. But the record doesn't reflect that. The bargaining agreement, the MOU, which is in the record, specifies a distinction between vacation and sick leave. They're largely in two separate articles of the MOU, Article 9, which concerns vacation and annual leave, Article 10, that concerns sick leave. Article 10.1 specifically references the buyback of sick leave. Article 10.2 discusses the permissible use of sick leave. Article 10.4 discusses reasons for denial of use of sick leave, such as if the injury was while gainfully employed elsewhere or the injury was the result of willful misconduct. That in and of itself demonstrates that you cannot use annual leave for whatever purpose. That's inconsistent with the bargain MOU. The issue, although Article 9, which talks about annual leave, references sick leave, it again delimits it for its purposes and specifically says it's for absences because of illness or injury other than job related. The 30b6 witness for the district. The huge excerpts. Could you just remind us of what page number to look at for the MOU? Yes, sir. The MOU, Articles 9 begins at ER 67 and Article 10 begins at ER 069. In addition. Thanks. In addition to that, the rule 30b6 witness for the district testified that the amount of scheduled annual leave, scheduled leave, that a person can take is determined by Exhibit B to the MOU. Where is the testimony? Who and where? It's the 30b6 witness for the defendant. The deposition is at ER, references at ER 186 to 187. And the witness is referring to Exhibit B to the MOU, which is at ER 099. And what the testimony is, is that Exhibit B to the MOU determines the amount of annual leave that may be scheduled, scheduled leave. And Exhibit B to the MOU actually discusses the accrual of vacation leave. And you. There's a distinction in the rationale between the rationale that distinguishes sick leave buyback from vacation leave buyback in terms of the burdens and benefits on the employers. Because, obviously, there's an incentive for the employer to minimize unscheduled absences because of sickness and to encourage employees to work so that they don't have to arrange for last-minute coverage. Given the way that the leave is structured in this particular case, where you can take sick leave or hours accumulated at the sick leave rate for any reason, how does that rationale work here in terms of your argument? Well, first, Your Honor, the MOU does not support the proposition that you can take hours accumulated as sick leave for any reason. The MOU simply does not provide for that. The employer is telling you that today and submitted a declaration for it. That's inconsistent with the articles in the MOU that I've just discussed. I'm having trouble seeing that here. It looks like at section 9.1, it says, All represented employees shall receive annual leave in lieu of separate vacation and sick leave. And I read the in lieu of to mean they don't get separate vacation leave, they don't get separate sick leave, they get annual leave in lieu of either one. That's what the words say anyway. Except, Your Honor, that same article then delimits and defines the different types of leave that you're entitled to so they do maintain their individual characteristic. And if you move to the next article of the MOU, it specifically details the reasons that you can use sick leave and the reasons that you cannot use sick leave. And that's all part of the same MOU. And to get back to this distinction between scheduled and unscheduled and the is easily relatable to the situation here. Not only is vacation leave scheduled in advance, and sick leave, of course, by its very nature is not, but when they account for it, they account for it as annual leave scheduled or annual leave unscheduled. And this gets to the issue of at the end of the year, can you know what it is you're buying back? And the answer is clearly yes. To use a simple example, if under the MOU Exhibit V, you accrued 80 hours of vacation leave that you can schedule during the next calendar year, and you used 80 hours that's been recorded in the system as annual leave scheduled, then any additional hours above the previous threshold that was added into that bank only comes from one place. It comes from the sick leave that's been accumulated pursuant to Article 10 of the agreement. So they may not at the end of the year choose to do that math, but it's very simple math, and they account for the time differently by recording annual leave scheduled, which is dependent on what you can schedule pursuant to Exhibit V of the MOU, from sick leave, which is denoted as annual leave unscheduled. Thank you very much, counsel. Thank you, Your Honor. Very helpful arguments on both sides. We'll submit the matter for decision. Thank you.
judges: Kleinfeld, Nguyen, Watford